IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 16, 2019

## BRANDAN DANE WINDROW v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2014-B-1221     Monte Watkins, Judge**

_____

### No. M2018-01911-CCA-R3-PC

_____

The Petitioner, Brandan Dane Windrow, appeals the Davidson County Criminal Court's denial of his petition for post-conviction relief from his convictions of aggravated assault and felony vandalism and resulting effective sentence of fourteen years in confinement. On appeal, the Petitioner contends that he received the ineffective assistance of trial counsel. Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ALAN E. GLENN, JJ., joined.

Umeka Foreman, Nashville, Tennessee, for the appellant, Brandan Dane Windrow.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Roger D. Moore, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background

In July 2015, a Davidson County Criminal Court Jury convicted the Petitioner of aggravated assault and vandalism of property valued $1,000 or more but less than $10,000. On direct appeal of his convictions, this court gave the following factual account of the crimes:

> The Defendant's convictions arose from a January 16, 2014 incident involving the victim, Kimberly Tennial. Ms. Tennial was leaving her

subdivision on her way to work at approximately 9:00 a.m. when she stopped to check her mail. The neighborhood's mailbox area was located near the entrance to the subdivision and was accessible via a one-way semi-circular drive, delineated by a sidewalk on one side and a landscaped oval median on the other side. Ms. Tennial parked her car between the two curbs, got out, checked her mailbox, and returned to her car. When she got back into her car, there were no other vehicles in the area. She admitted that she was parked facing in the wrong direction of the one-way drive. Upon entering her car, she placed her mail in the passenger's seat and put her mailbox key back in the "cubbyhole" where she usually kept it. When she looked up, there was a vehicle parked directly in front of her, "front bumper to front bumper." She described the vehicle as a sport utility vehicle ("SUV") and said that because of the close proximity of the SUV, she could see directly into the vehicle and could clearly see the driver, a man, who was the car's only occupant. She identified the Defendant as the driver.

The Defendant "yelled out of his window," and Ms. Tennial "rolled [her] window down just a little bit." The Defendant asked for her help, explaining that he had moved into the neighborhood within the past two weeks and did not yet have his mailbox key. Ms. Tennial told him that she could not help him and advised him that he should speak to the homeowners' association. The Defendant asked to use her mailbox key, and she declined his request. Ms. Tennial then "put up [her] hand like wait a minute, as if [she] wanted to get out of his way." She placed her car in reverse and began backing up. Ms. Tennial said that because the drive was circular, she hit the curb several times and was taking her time to back out. According to Ms. Tennial, "every time [she] would go in reverse, [the Defendant] would push on the gas and come towards [her]." She again put her hands up, "like hold on a minute."

Ms. Tennial said that while attempting to back out, her car went up on the curb and onto the sidewalk, and the Defendant rammed into the back driver's side of her car, "right above the back wheel." She began yelling at him, saying, "[W]hat is wrong with you, what is your problem[?]" She said that she became very afraid. The Defendant exited his vehicle, and he lay down "in a shrubbery area right where the mailboxes [we]re" and said, "[L]ook, I'm hurt."

Ms. Tennial called 911 and drove her car back toward the interior of the neighborhood. The Defendant got back into his car and "started driving

really erratically around [her] car like he wanted to hit [her] again." Ms. Tennial pulled in front of a neighbor's condominium, explaining that she did not return to her own home because she did not want the Defendant to know where she lived. Ms. Tennial parked her car in a parking space, and the Defendant backed his SUV into a parking spot located two spaces away from her, leaving one space in between their vehicles. The Defendant yelled that he needed her insurance information, and she yelled back, "[N]o, not until the police get here." He again asked for her information, and she gave him the same answer. According to Ms. Tennial, the Defendant began "yell[ing] expletives about the police . . . and then he sped off a little bit." She thought he was driving away, but the Defendant then "backed up and hit [her] car a second time[,] . . ." again striking the rear driver's side of her car. One of Ms. Tennial's neighbors exited his home with a gun and "told [the Defendant] to stop." At that point, the Defendant "sped on out of the subdivision."

Ms. Tennial denied that the Defendant's actions were accidental, saying that the first time he hit her car she was "trapped" and attempting to back up her car. The second time the Defendant hit her, she was parked, and he "sped off" before putting his SUV in reverse and hitting her car.

Ms. Tennial said that, although her car was pointing in the wrong direction when she was parked near the mailboxes, people often went the wrong way through the drive when checking their mail while leaving the neighborhood. She said that the "common courtesy" was for anyone who wished to enter the drive from the proper direction to first allow the person already there to exit the area. She agreed that the semi-circular drive was short, and if two cars were there at the same time, they would necessarily be very close together.

Police officers arrived five to ten minutes after Ms. Tennial called 911, and she was able to provide them with the Defendant's license plate number. Detective Robert Shelton of the Metropolitan Nashville Police Department was assigned to investigate the incident. He used the license plate information to check the car's registration. The tag number matched a Ford Expedition owned by the Defendant. Det. Shelton then put together a photographic lineup, from which Ms. Tennial was able to identify the Defendant.

Ms. Tennial testified that the damage to her car totaled more than $1,000 but less than $10,000.

State v. Brandan Dane Windrow, No. M2015-02094-CCA-R3-CD, 2016 WL 3610356, at *1-2 (Tenn. Crim. App. at Knoxville, June 28, 2016), perm. app. dismissed, (Tenn. June 6, 2018).[1]

After a sentencing hearing, the trial court sentenced the Petitioner as a Range II, multiple offender to eight years for the aggravated assault conviction, a Class C felony, and six years for the vandalism conviction, a Class D felony. The trial court ordered that the Petitioner serve the sentences consecutively for a total effective sentence of fourteen years in confinement.

The Petitioner filed a pro se petition for post-conviction relief, claiming that he received the ineffective assistance of counsel. Relevant to this appeal, the Petitioner alleged that trial counsel was deficient by advising him to waive his right to testify, which resulted in his waiver being unknowing and involuntary. The post-conviction court appointed counsel, and post-conviction counsel filed an amended petition, adding that trial counsel was ineffective by failing to have a material witness, Arna Talley, testify on the Petitioner's behalf at trial.

At the evidentiary hearing, the thirty-four-year-old Petitioner testified that he went through the ninth grade in school and that he had never been a defendant in a trial prior to his own trial. The trial court appointed trial counsel to represent him, and trial counsel did not explain the advantages and disadvantages of testifying. Post-conviction counsel asked the Petitioner if he signed "anything" waiving his right to testify. The Petitioner responded, "I think I did, I'm not really sure. . . . The only thing I remember signing was [trial counsel] told me to sign something about doing the best of his abilities as my attorney, he showed me like some kind of paper like that."

The Petitioner testified that the trial court asked him if he wanted to testify and that he told the trial court no. However, the Petitioner did not understand what he was doing when he told the trial court that he did not want to testify. Trial counsel was present during the Petitioner's Momon colloquy with the trial court, but trial counsel did not ask the Petitioner anything under oath about his decision not to testify, did not ask him any specific questions in open court about waiving his right to testify, and did not read a waiver in front of the trial court.

The Petitioner testified that after his preliminary hearing, he and trial counsel discussed having a witness, who was at the scene of the crimes, testify on his behalf. The Petitioner learned about the witness, Arna Talley, from a police report in his discovery

---

[1] Our supreme court dismissed the Petitioner's Rule 11 application because it was untimely.

materials and asked trial counsel to subpoena Talley. Trial counsel kept telling the Petitioner that he was "working on it" but eventually told the Petitioner that he could not find Talley and that Talley was a felon and a sex offender. The Petitioner did not understand why trial counsel could not find Talley if Talley "was on record somewhere."

On cross-examination, the Petitioner testified that he and post-conviction counsel did not try to find Talley and that Talley was not present to testify at the evidentiary hearing. The Petitioner acknowledged that although he had never been part of a trial prior to his own trial, he had been in court "quite a few times" as a defendant. He also acknowledged that he had "[q]uite a few" felony convictions. The State asked the Petitioner if he knew he could have been questioned at trial about his prior record, and the Petitioner said no. He acknowledged that he had a prior conviction of filing a false report, which was a crime of dishonesty. The jury also may have heard that he had a prior conviction of robbery. Trial counsel and the Petitioner did not discuss the State's being able to cross-examine him about his prior convictions and did not discuss how his prior convictions could affect the jury.

The Petitioner acknowledged that he could read and write. At that point, the State showed him a document, and he acknowledged signing the document on July 13, 2015, during his trial. The State asked him to read the document aloud, and the Petitioner read as follows:

> Waiver of right to testify during trial: I understand I have the right to not testify, and that if I choose not to testify, the jury may not draw any inference from my failure to testify.
>
> I understand that I have the right to testify, and that if I wish to exercise that right no one can prevent me from testifying.
>
> I have consulted with my counsel in making the decision whether or not to testify. My counsel has advised me of the advantages and disadvantages of testifying. After considering my rights and asking any questions I had regarding those rights, I voluntarily and personally chose to waive my right to testify.

The State then showed the Petitioner a second document, and the Petitioner acknowledged signing it. The State asked the Petitioner to read a portion of the document aloud, and the Petitioner read as follows:

> The undersigned below do hereby acknowledge that my attorney, [trial counsel], has discussed with me the charges, the range of punishment, the

discovery provided by the State of Tennessee, the possible defenses at my trial, my testimony, and has not guaranteed any outcome, it is therefore my choice to reject the plea offer agreement and proceed to a jury trial. And I am satisfied with the work my attorney, that he has done leading up to the trial.

The Petitioner explained that trial counsel "handed [him] something" and that trial counsel told him to sign it. The Petitioner trusted trial counsel, so he signed the second document. However, he did not remember reading the second document before he signed it. On redirect examination, the Petitioner testified that he signed the second document in April 2015 but that he did not go to trial until July 2015.

Trial counsel testified for the State that he had been licensed to practice law since 2013 and that the trial court appointed him to represent the Petitioner. Trial counsel conducted the Petitioner's preliminary hearing, received discovery, and went over discovery materials with the Petitioner. Trial counsel said that Arna Talley was the person "who came out with a firearm" and that he "reached out" to Talley. However, Talley was "uncooperative." Moreover, "[Talley] did not see anything that would like negate an essential element or anything like that, he just heard a commotion and then came out with a gun[.]" The defense's theory was that the incident with the victim was a car accident, and trial counsel was concerned that Talley would say he came outside to protect a neighbor, which would "completely undermine" that defense. Trial counsel and the Petitioner discussed trial counsel's concern.

Trial counsel testified that he and the Petitioner had "multiple in-depth conversations" about the Petitioner's testimony and that he was present during the Petitioner's Momon hearing. The victim had no criminal history, was a working professional, and was at her own residence. Therefore, trial counsel had "a serious concern" about the Petitioner's testimony. Trial counsel asked the Petitioner why he was in the subdivision, and the Petitioner said he was there "to see a female." However, the Petitioner could not remember the woman's name, and trial counsel was worried that cross-examination by an experienced prosecutor "could get very troublesome in front of a jury." The Petitioner decided not to testify. Trial counsel identified the second document signed by the Petitioner and said he prepared the document because he "wanted a clear delineation" of what he and the Petitioner discussed during his representation.

On cross-examination, trial counsel testified that he did not remember if he actually spoke with Talley. According to trial counsel's notes, though, Talley told detectives that "he did not see anything, he just heard the commotion and then came outside to render assistance." Post-conviction counsel asked how Talley could have been "uncooperative" if trial counsel never spoke with Talley. Trial counsel said he assumed

that he "reached out" to Talley and that Talley did not call him back. The Petitioner signed a written waiver of his right to testify, and he and trial counsel went over the waiver before he signed it. Trial counsel and the Petitioner discussed the Momon requirements "ad nauseum," and the trial court "handled" the Momon colloquy at trial.

In a written order, the post-conviction court accredited trial counsel's testimony that he and the Petitioner discussed the advantages and disadvantages of the Petitioner's testifying. The court also accredited trial counsel's testimony that Arna Talley was uncooperative. The post-conviction court denied the petition for post-conviction relief.

## II. Analysis

On appeal, the Petitioner maintains that trial counsel was deficient by advising him to waive his right to testify, which resulted in his waiver being unknowing and involuntary. In support of his argument, he notes that the trial court, not defense counsel, conducted his Momon hearing. The Petitioner also contends that trial counsel was ineffective by failing to have Arna Talley testify on his behalf at trial. The State argues that the Petitioner has failed to demonstrate that he is entitled to relief. We agree with the State.

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's

performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Further,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

As to the Petitioner's claim that trial counsel was deficient by advising him not to testify, which resulted in his waiver being unknowing and involuntary, Momon v. State, 18 S.W.3d 152, 161 (Tenn. 1999), provides that a criminal defendant has a fundamental, constitutional right to testify at trial. That fundamental right must be waived by the defendant himself. Momon, 18 S.W.3d at 161. "Generally, a right that is fundamental and personal to the defendant may only be waived if there is evidence in the record demonstrating 'an intentional relinquishment or abandonment of a known right or privilege.'" Id. at 161-62. Therefore, before the conclusion of the proof at trial, a Momon hearing must be held outside the presence of the jury, demonstrating that the defendant understands that:

> (1) the defendant has the right not to testify, and if the defendant does not testify, then the jury (or court) may not draw any inferences from the defendant's failure to testify;
>
> (2) the defendant has the right to testify and that if the defendant wishes to exercise that right, no one can prevent the defendant from testifying;
>
> (3) the defendant has consulted with his or her counsel in making the decision whether or not to testify; that the defendant has been advised of the advantages and disadvantages of testifying; and that the defendant has voluntarily and personally waived the right to testify.

Id. at 162. As our supreme court has explained,

> Defense counsel is generally in the best position to voir dire the defendant concerning a waiver of the right to testify, and the hearing outlined above will avoid any possible perceived pitfalls of mandating direct questioning by the trial court itself. Since the right to testify is the mirror image of the right to remain silent, there is an inherent risk that a trial judge participating in the questioning may cast an unflattering light on the right not to testify. See Commonwealth v. Hennessey, 23 Mass. App. Ct. 384, 502 N.E.2d 943, 947 (1987). Under normal circumstances, therefore, the trial judge should play no role in this procedure, unless the judge believes there is evidence that the defendant is not making a valid waiver of the right to testify. In such a case, the trial judge is obliged to question the defendant directly to the extent necessary to ensure a valid waiver.

Id.

In this case, the post-conviction court accredited trial counsel's testimony that he and the Petitioner discussed the advantages and disadvantages of the Petitioner's testifying and that it was the Petitioner's decision not to testify. We note that trial counsel also gave valid reasons as to why he advised the Petitioner not to testify. Specifically, trial counsel was concerned that the jury would hear about the Petitioner's prior criminal history and that he would not do well when cross-examined about the facts of the case. As to the Petitioner's Momon hearing, defense counsel, not the trial court, should have conducted the hearing. However, the Petitioner signed a written waiver of his right to testify, the waiver addressed the requirements set out in Momon, and trial counsel testified that he and the Petitioner went over the waiver before the Petitioner signed it. Moreover, the Petitioner did not explain at the evidentiary hearing what he would have said at trial that would have changed the outcome of his case. Therefore, he has failed to demonstrate that trial counsel was deficient in advising him not to testify or that he was prejudiced by the trial court's conducting the Momon colloquy.

Regarding the Petitioner's claim that trial counsel was ineffective for failing to have Arna Talley testify on his behalf at trial, the post-conviction court accredited trial counsel's testimony that he tried to talk with Talley but that Talley was "uncooperative." Regardless, the Petitioner did not have Talley testify at the evidentiary hearing. "When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). We

- 9 -

may not speculate on what benefit any witness might have offered to the Petitioner's case. <u>Id.</u>  Accordingly, the Petitioner is not entitled to post-conviction relief.

### III.  Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA MCGEE OGLE, JUDGE